**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| POM WONDERFUL LLC, a Delaware limited liability company, | **Case No. 1-09-cv-04916-CM** |
| | Assigned to Hon. Colleen McMahon |
| Plaintiff and Counterdefendant, | |
| v. | |
| ORGANIC JUICE USA, INC., a New York corporation; and DOES 1-10, inclusive, | |
| Defendants. | |
| AND RELATED COUNTERCLAIMS | |

## DECLARATION OF HENRY D. OSTBERG IN SUPPORT OF POM WONDERFUL LLC'S MOTION FOR SUMMARY JUDGMENT RE: COUNTERCLAIMS

LOEB & LOEB LLP
Christian D. Carbone (CC-6502)
345 Park Avenue
New York, New York 10154
(212) 407-4000

ROLL LAW GROUP P.C.
Daniel S. Silverman (*Admitted Pro Hac Vice*)
Daniel A. Beck (*Admitted Pro Hac Vice*)
11444 West Olympic Boulevard
Los Angeles, California 90064
(310) 966-8400

Attorneys for Plaintiff and Counterdefendant
POM Wonderful LLC

{040347.1}

## DECLARATION OF HENRY D. OSTBERG

I, Henry D. Ostberg, declare as follows:

1.     I was retained by Roll Law Group P.C., on behalf of Pom Wonderful LLC ("Pom"), to review and offer my opinion regarding the expert report of Thomas J. Maronick ("Maronick Report"), which concerns the Internet surveys conducted by Dr. Maronick. I submit this declaration in support of Pom's motion for summary judgment against the counterclaims asserted by defendant and counterclaimant Organic Juice USA, Inc. ("Organic Juice").

2.     I am the president of the Admar Group, Inc. and have been the president of the company (and its predecessors) for over thirty-five (35) years. In that capacity, I have conducted or supervised over 2,000 consumer surveys conducted for such clients as Lever Brothers, Miller Brewing Company, IBM, Federal Express, Revlon and Chrysler Corporation, among others.

3.     I have received a law degree from New York Law School and M.B.A. and Ph.D. degrees from Ohio State University. Although I have passed the New York Bar, I have not practiced law.

4.     I have been retained as a marketing research expert in connection with trademark and intellectual property litigation in over 200 different cases. I have testified in court approximately 40 times, been deposed under oath an additional 35 times and have provided sworn affidavits on another 50 occasions. In the remaining instances (over 80), the results of the survey conducted by me did not support the position or claims of the client who had retained my services and the findings of the survey were used for the client's internal guidance. Both state and federal courts have repeatedly qualified me as a marketing research expert.

5.     I have been a frequent speaker on the subject of marketing, the use of surveys and related topics before a variety of professional organizations, including the American Marketing Association, American Management Association, Advertising Research Foundation, Marketing Research Trade Association, Association of National Advertisers, the International Trademark Association, the New York Bar Association, and over a dozen different trade associations.

6.     I was formerly an Associate Professor at New York University and, prior to that, was on the faculty of Ohio State University. I have lectured on repeated occasions at Columbia University Law

School on the use of consumer surveys in litigation.

7. Attached as Exhibit A hereto is a true and correct copy of my rebuttal report in this action, dated April 26, 2010, which sets forth my opinion regarding the Maronick Report and the Internet surveys that the Maronick Report is based upon.

8. In addition to the defects discussed in my rebuttal report, the subsequent deposition of Dr. Maronick revealed that he used what he called a "reading test" for his survey, meaning his survey displayed the print advertisement while asking the respondents answer questions about that advertisement. In other words, respondents were able to look up the answer to the questions asked by the interviewer during the course of the interview. That is not what happens in the real world, where no interviewer is present to ask the potential purchasers questions and where respondents cannot then look up the answers to the questions asked. An appropriate research method would have been to request respondents to look at the advertisement the "way they would do if they were to see it in a newspaper or magazine" and removing it from view before the questions are asked. That is the correct way to determine what an advertisement would communicate in the real world, where there is no interviewer present to guide the consumer concerning what to look for. The Maronick survey data fails to reflect how consumers in the real world view and react to an advertisement.

9. It is my professional belief that Dr. Maronick's surveys failed to conform to the requirements of a properly-conducted consumer survey, due to the numerous and fatal defects set forth in my rebuttal report, in this declaration, and in my deposition testimony. As a result, the findings of the Maronick Expert Report lack validity and reliability, and cannot purport to represent the opinions of prospective pomegranate juice purchasers. Indeed, based only on the defective way the questions in the Maronick survey were phrased, the resulting data (disregarding all the other major defects) is unreliable and without real-world significance.

10. Furthermore, the numerous errors in Dr. Maronick's surveys and the Maronick Report (such as his failure to use the correct skip patterns for his print advertisement survey) are not consistent, in my view, with the exercise of reasonable professional care by Dr. Maronick in designing and conducting the surveys.

11.     As noted above, I have been retained as a marketing research expert in connection with trademark and intellectual property litigation in over 200 different cases.  It is my professional belief that Dr. Maronick's surveys as described in the Maronick Report are in my professional experience among the most deficient consumer surveys that I have encountered to date in connection with my retention in such cases.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration was executed in Alpine, New Jersey on this 29th day of June 2010.

By: _____
Henry D. Ostberg

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

POM WONDERFUL LLC, a Delaware
limited liability company,

Plaintiff,

v.

ORGANIC JUICE USA, INC., a New York
corporation; and DOES 1-10, inclusive,

Defendants.

-----------------------------------------------------

ORGANIC JUICE USA, INC., a New York
corporation,

Counter-Plaintiff,

v.

POM WONDERFUL LLC, a Delaware
limited liability company,

Counter-Defendant.

Civil Action No. 1-09-cv-04916-CM

## EXPERT REPORT OF HENRY D. OSTBERG

### I. MY ENGAGEMENT

1. I was retained by Roll Law Group P.C., on behalf of POM Wonderful LLC, to review and offer my opinion regarding an expert report of Thomas J. Maronick, DBA, JD, which concerns the internet surveys conducted by Dr. Maronick.

(1)

## II. MY QUALIFICATIONS

2.   I am the president of the Admar Group, Inc. and have been the president of the company (and its predecessors) for over thirty-five (35) years.  In that capacity, I have conducted or supervised over 2,000 consumer surveys conducted for such clients as Lever Brothers, Miller Brewing Company, IBM, Federal Express, Revlon and Chrysler Corporation, among others.

3.   I have received a law degree from New York Law School and M.B.A. and Ph.D. degrees from Ohio State University.  Although I have passed the New York Bar, I have never practiced law.

4.   I have been retained as a marketing research expert in connection with trademark and intellectual property litigation in over 200 different cases.  I have testified in court approximately 40 times, been deposed under oath an additional 35 times and have provided sworn affidavits on another 50 occasions.  In the remaining instances (over 80), the results of the survey conducted by me did not support the position or claims of the client who had retained my services and the findings of the survey were used for the client's internal guidance.  Both state and federal courts have repeatedly qualified me as a marketing research expert.  A list of recent trademark- and advertising-related litigation in which I have been an expert witness is listed in paragraph 46 below.

5.  I have been a frequent speaker on the subject of marketing, the use of surveys and related topics before a variety of professional organizations, including the American Marketing Association, American Management Association, Advertising Research Foundation, Marketing Research Trade Association, Association of National Advertisers, the International Trademark Association, the New York Bar Association, California Bar Association, and over a dozen different trade associations.

6.  I was formerly an Associate Professor at New York University and, prior to that, was on the faculty of Ohio State University.  I have lectured on repeated occasions at Columbia University Law School on the use of consumer surveys in litigation.

### III. DESCRIPTION OF THE MARONICK SURVEYS

7.  Dr. Maronick conducted three surveys.  The respondents in each of the three surveys were individuals, 21 years of age or older, who said that they had purchased pomegranate juice in the past year or "would consider purchasing it."  Individuals were limited to consumers in three states - - New York, New Jersey and Connecticut.  All respondents were members of a pre-recruited panel, who had been sent an email by the internet company which had recruited them and operated the panel, inviting them to participate in an online survey.  Maronick Expert Report, ¶6.

8.  The panel members were shown, on the internet, either: (a) a POM print advertisement which included the POM bottle without the "from concentrate" statement on the bottle in the advertisement; or (b) the same POM advertisement with the words "from concentrate" added on

(3)

the bottle - - which Dr. Maronick considered his control; or (c) a one-minute video on POM's website, called "Tree to Bottle." Maronick Expert Report, ¶8 & ¶9.

9.  After being exposed to one of the two printed advertisements or to the "Tree to Bottle" video, respondents were asked a series of questions. The first of these questions was "What does the ad say or suggest about this pomegranate juice?" with the respondents being asked to type in their responses. Maronick Expert Report, ¶8. However, data from this question was not included in the Maronick report, other than the simple statement that respondents did not volunteer an opinion concerning whether POM was or was not made from concentrate (not surprising since it was not called for by the question).

10.  The remaining questions were closed-ended; different answer options were listed and the respondents were called on to select the answer option they deemed most appropriate.

## IV. MAJOR DEFECTS OF THE MARONICK SURVEYS

11.  The Maronick survey of the POM print advertisement suffered from a series of fatal defects, including:

- The survey was limited to internet users who were members of a pre-recruited panel (although the subject matter of the surveys had no connection to internet use).

- The respondents interviewed included past purchasers of pomegranate juice (although only prospective purchasers are the proper universe for a false advertising claim).

- Even the respondents who Dr. Maronick considered to be prospective purchasers were not really prospective purchasers of pomegranate juice.

(4)

- The key questions of the interview were unclear, confusing and almost incapable of being answered.

- Respondents were not offered a "don't know" answer option for a key closed-ended question (forcing respondents to select among alternative answers even when they had no opinion about the issue).

- There was no rotation of the pre-listed answer options to the closed-ended questions.

- Both the survey in its execution and the subsequent Maronick report evidenced significant errors, undermining the integrity of the whole survey.

12.  The survey concerning the "Tree to Bottle" video has most of the same defects as the print advertisement survey, plus an additional defect:  It had no control, making the alleged findings impossible to interpret.  Maronick Expert Report, ¶9.

## V. USE OF AN INTERNET PANEL IS NOT APPROPRIATE

13.  Internet surveys, i.e., studies which are conducted with internet users who are members of a pre-recruited panel, have limitations.  Companies which operate internet panels obtain their potential respondents by soliciting internet users to find people who agree to answer different surveys over a period of time.  Since only a small percentage of the consumers contacted will tend to accept such solicitations, the resulting panel may or may not reflect a true cross-section of retail consumers.

14.  Many prospective pomegranate juice purchasers may not be internet users.  As a result, the findings of the Maronick surveys cannot purport to be representative of a true cross-section of all prospective purchasers of pomegranate juice.

15.   To have a standing in litigation, a survey must reflect the universe involved.

According to the *Reference Manual on Scientific Evidence*:

> "Identification of a survey population must be followed by selection of a sample that *accurately represents* that population."[1] (Emphasis added.)

16.   Courts have repeatedly stated that for a survey to be valid:

> "The persons interviewed must *adequately represent* the opinions which are relevant to the litigation."[2] (Emphasis added.)

17.   While internet surveys may be suitable for products or services sold or investigated on the internet, the use of an internet panel for a survey about a common consumer product (such as pomegranate juice) is not appropriate.

## VI. FAILURE TO INTERVIEW PROSPECTIVE PURCHASERS

18.   The respondents in the three Maronick surveys were "individuals 21 and older who had purchased pomegranate juice in the past *or would consider purchasing it*." (Emphasis added.)  Maronick Expert Report, ¶6.

19.   It is well established that Lanham Act surveys should be conducted with prospective purchasers of the product type at issue.  In the frequently-cited *American Luggage Works* decision, the court stated:

---

[1] Reference Guide on Survey Research, *Reference Manual on Scientific Evidence,* 229, 242 (2d ed. 2000)

[2] *Amster Corp. v. Domino's Pizza*, 615 F. 2d 252, 264 (5th Cir. 1980)

> "(The) issue is whether the goods would be confused by a *prospective purchaser* at the time he considered making the purchase."[3] (Emphasis added.)

Courts have repeatedly rejected, or given very little weight to, surveys which were conducted among past purchasers, rather than prospective purchasers.[4]

20.  There is a good reason why advertising surveys need to be conducted among prospective purchasers.  The common law governing advertising, as well as the Lanham Act, is designed to protect intellectual property owners and consumers from false claims which would divert sales to the party making the false claims.  Unless someone is a prospective purchaser, the false statements would cause no injury.

21.  Past purchasers are *not* necessarily future purchasers.  To the contrary, past purchasers may be rejecters of the product based on their prior product experience.  Therefore, the inclusion of past purchasers, unless they are *also* future purchasers, is a major defect of the Maronick surveys.

22.  Moreover, Dr. Maronick failed to include true prospective purchasers in his surveys.  Dr. Maronick considered anyone who gave a "yes" reply to the following question as a prospective purchaser:

> "Would you *consider* buying 100% pomegranate juice?" (Emphasis added.)

---

[3] *American Luggage Works, Inc. v. U.S. Trunk Co.*, 158 F. Supp 50, 53 (D. Mass. 1957), *aff'd*, 259 F.2d 69 (1st Cir. 1958).
[4]  *Universal City Studios, Inc. v. Nintendo Co., Ltd.*, 746 F. 2d 112, 118 (2d Cir. 1984); *American Footwear Corp. v. General Footwear Co.,* 609 F. 2d 655, 661 n. 4 (2d Cir. 1979), cert. denied, 445 U.S. 951 (1980); *Jordache Enterprises, Inc. v. Levi Strauss & Co.*, 841 F. Supp. 506, 518-19 (S.D.N.Y. 1993)

Consumers might *consider* buying a product, but decide not to do so (because of price or other reasons). "Considering" buying a product, especially without a time frame, is *not* the same as having a current intention to make an actual purchase.

23.   The customary question for finding prospective purchasers is to ask respondents the following, with the time period specified:

> "During the next three months, do you think you *will buy* a bottle of pomegranate juice?"  (Emphasis added.)

Why Dr. Maronick deviated from this usual and accepted question to find prospective purchasers is difficult to understand (unless it was to ensure that he could find enough respondents on the panel he used to conduct his surveys).

24.   In summary, the Maronick surveys are fatally defective because they include past purchasers who may not be prospective purchasers, and the so-called prospective purchasers were merely individuals who said they would "consider" buying pomegranate juice in the indefinite future (without necessarily having an actual intention to do so).

25.   The need to have a proper sample is critical to a valid survey.  The *Reference Manual on Scientific Evidence,* published by the Federal Judicial Center, states the following:

> "A survey that provides information about a wholly irrelevant universe of respondents is itself irrelevant.  Courts are likely to exclude the survey or accord it little weight."[5]

---

[5] Shari Diamond, *Reference Guide on Survey Research,* 229, 241 (2d ed. 2000)

Thomas J. McCarthy, the author of the frequently-cited text on trademarks and unfair competition, put it this way:

> "A survey of the wrong 'universe' will be of little probative value in litigation."[6]

(While courts have occasionally accepted false advertising surveys where the respondents included past purchasers, it appears that in most of these cases the opposing side failed to challenge their suitability.)

## VII. UNCLEAR AND CONFUSING QUESTIONS

26.  A key question - - in fact, perhaps *the* key question of the Maronick surveys - - involved asking respondents "How is POM Wonderful Made?," with respondents requested to select from the possible answers listed.  The question was:

> "Based on what is said or suggested in the ad, how is POM Wonderful made?"

Two of the listed options were:

> "From fruit without any processing"

> "From fruit but with some processing"

There was no explanation of the term "processing."  How can consumers be expected to answer whether POM is made with or without "processing" without knowing what is meant by the term "processing"?

---

[6] Thomas J. McCarthy, *Trademarks and Unfair Competition* § 32:159 (4th ed. 2008)

The other answer options to that question - - "from concentrate without any processing" and "from concentrate but with some processing" - - presented another distinction which consumers could not be expected to know.

To complicate the question further, there was still another choice, "from artificial flavors."

27.  The other key question of the Maronick surveys was also troubling.  Respondents were asked:

> "Based on what is said or suggested in the ad, is POM Wonderful Pomegranate juice made from concentrate?"

The POM print advertisement and video did not have any statement or implication about whether the product was or was not made from concentrate.  Therefore, the proper question would have eliminated the phrase "based on what is said or suggested in the ad," and be phrased as follows:

> "Based on the advertisement you just saw, do you think that POM Wonderful Pomegranate juice is made or is not made from concentrate, or *you don't know*?"

28.  In brief, the Maronick surveys failed to fulfill an essential requirement of a reliable survey.  According to the *Reference Guide on Survey Research,* published by the Federal Judicial Center, questions must be "framed to be clear, precise and unbiased." [7]  The *Manual for Complex Litigation* has established the same requirement:

---

[7] Shari Diamond, *Reference Guide on Survey Research*, 248 (2d ed. 2000)

(10)

" . . . in assessing the validity of a survey, the judge should take into account the following factors:  whether the questions asked were clear and not leading. . . "[8]

29.   Based only on the way the questions in the Maronick surveys were phrased, the resulting data (disregarding all the other major defects) is unreliable and without real-world significance.

## VIII. FAILURE TO INCLUDE A "DON'T KNOW" ANSWER OPTION

30.   Again, it is necessary to compare the Maronick surveys against the requirements set forth in the *Reference Manual on Scientific Evidence* and customary marketing research practices. According to the *Reference Manual*:

" . . . the survey can use a quasi-filter question to reduce guessing by providing 'don't know' or 'no opinion' options as part of the question . . . . By signaling to the respondent that it is appropriate not to have an opinion, the question reduces the demand for an answer and, as a result, the inclination to hazard a guess just to comply."[9]

31.   Dr. Maronick failed to provide a "don't know" for the key closed-ended question of his surveys concerning how POM was made, i.e., whether from concentrate, fruit or artificial flavors and whether it was with or without processing.  (Question 7 of his survey.)

32.   Making this omission of "don't know" even more serious is the fact that Dr. Maronick did not have the usual "no guessing" instructions at the beginning of his questionnaires.  It is a standard practice to include such a statement, at the start of an interview, requesting respondents

---

[8] *Manual for Complex Litigation*, 4th ed.  § 11.493
[9] Shari Diamond, *Reference Guide on Survey Research*, 250 (2nd ed. 2000).

not to guess when giving their answers to the questions asked. A typical form of such instructions is:

> "I don't want you to guess when answering any of my questions.

> "If you don't know the answer, please tell me so. 'Don't know' is an entirely acceptable answer."

Failing to include this usual request means that the Maronick surveys encouraged consumers to give responses, no matter whether or not they had an opinion about the question asked.

## IX. FAILURE TO ROTATE ANSWERS TO CLOSED-ENDED QUESTIONS

33. While the defects mentioned previously - - by themselves - - destroy the validity of the findings of the Maronick Expert Report, there was another significant problem with his surveys: The order in which the alternative answer choices to the closed-ended questions were listed was not rotated. It is known that when a possible answer is listed first on a list, it tends to be selected more frequently than when it is put lower in the list. Because of this fact, the various answers to closed-ended questions should have been rotated among different respondents.

34. According to the *Reference Manual on Scientific Evidence:*

> "The order in which questions are asked on a survey and the order in which response alternatives are provided in a closed-ended question can influence the answers." [10]

---

[10] Shari Diamond, *Reference Guide on Survey Research*, 254 (2nd ed. 2000).

Again, the Maronick surveys failed to conform to the usual and customary requirement of a valid survey.

## X. ERRORS IN SURVEY EXECUTION AND SUBSEQUENT REPORT

35.  A major error occurred in what the panel members were shown in the survey.  This serious error, which itself undermines the findings of the entire survey, is noted in small type as footnote 4 of the Maronick report (page 8).  There it is stated:

> "There was an error in the questionnaire and respondents who saw the ad without the 'from concentrate' were expected to skip to the demographics. In fact, those respondents also saw the second ad by mistake."

In other words, these respondents were shown *both* the actual POM print advertisement (with a POM bottle without the "from concentrate" statement) and the so-called control advertisement with the "from concentrate" statement added to the bottle.

36.  Because the same respondents saw both the advertisements with and without the "from concentrate" statement on the POM bottle, it is impossible to know whether their answers were a reaction to one or both of these advertisements.  Even though the advertisements were shown sequentially, the respondents could have gone back to their earlier answers and revised their answers based on the second advertisement shown to them.  There is nothing in the Maronick report to indicate that this was not possible.  As a result, the purported answers for the actual POM bottle are unreliable and cannot be the basis of Dr. Maronick's findings.

(13)

37.   The errors of the Maronick surveys extend even to the Maronick report itself.  In Table 1, which purports to show the answer to the question "How is POM Wonderful Made?," he lists as the second answer to that question "From concentrate without any processing" and as the fourth answer the *same* "From concentrate without any processing."  Maronick Expert Report, p. 6.  The latter was undoubtedly meant to be "From concentrate with some processing."  The same error occurs in Table 4 of the Maronick report (page 8).

38.   Since the same mistake was repeated, it is more than a typographical error.  It suggests, together with the problem experienced in what was shown to the respondents, that the entire survey suffered from insufficient care or attention.

## XI. LACK OF CONTROL FOR VIDEO SURVEY

39.   The answers to questions asked in the survey may be influenced by the way the question is asked, the beliefs respondents may have independent of what was shown to them during the interview, the tendency of respondents to give "easy" answers which come to their mind quickly and other factors.  That is why it is often necessary to have a control in a survey.  In a 2010 decision, the judge said:

> "A survey designed to estimate likelihood of confusion must include a proper control.  A control is designed to estimate the degree of background 'noise' or 'error' in the survey.  Without a proper control, there is no benchmark for determining whether a likelihood of confusion estimate is significant or merely reflects flaws in the survey methodology."[11]

---

[11] *THOIP v. The Walt Disney Company*;, et al., 08 Civ. 6823 (SAS).(S.D. N.Y., 2010)

40.   Dr. Maronick apparently knows this requirement.  He developed a control for the printed advertisement tested.  Why he would not do so for the "Tree to Bottle" video is not explained.  (It cannot be argued that the control for the printed advertisement could also serve as a control for the video).

41.   Without a control for the "Tree to Bottle" video, the survey data for that video cannot be properly interpreted.

## XII. MY OPINION

42.   It is my professional belief that the Maronick surveys failed to conform to the requirements of a properly-conducted consumer survey, due to the numerous and fatal defects discussed above.  As a result, the findings of the Maronick Expert Report lack validity and reliability, and cannot purport to represent the opinions of prospective pomegranate juice purchasers.

## XIII. DOCUMENTS REFERRED TO

43.   In preparation of this affidavit, I referred to the following items:

   a.   Expert Report of Thomas  J. Maronick, DBA, JD

   b.   Shari Diamond, *Reference Guide on Survey Research* (2nd ed. 2000)

   c.   *Manual for Complex Litigation,* (4th ed.)

   d.   Thomas J. McCarthy, *Trademarks and Unfair Competition* (4th ed. 2008)

(15)

## XIV. COMPENSATION

44.   The Admar Group is being compensated at the standard hourly rate of $875 for reviewing the three Maronick surveys and related work.

## XV. MY PUBLICATIONS

45.   During the past ten years, I have written the following article: "Response to the Article Entitled, A 'Reading' Test or a 'Memory' Test:  Which Survey Methodology Is Correct?" *The Trademark Reporter,* Vol. 95, No. 6.

## XVI. CASES WHERE I HAVE TESTIFIED AT TRIAL OR IN DEPOSITION

46.   During the past six years or so, I have testified at trial or at a deposition in the following litigations:

Kemp v. Bumblebee, 2002 WL 31185860 (D.C. Minn 2002)

The Scotts Company v. Pursell Industries, Inc. & United Industries Corp., 3:02 CV 240 (E.D. Va. 2002)

Guinness United Distillers & Vintners B.V. v. Anheuser-Busch, Inc., 02 Civ. 0861 (LMM) (S.D.N.Y 2002)

In the Matter of Certain Bearings and Packaging Thereof, International Trade Commission, Investigation 337-TA-469, 2002/3

Citizens Financial Group, Inc. v. The Citizens National Bank of Evans City and Citizens, Inc., Civ 01-1524, (W.D. PA, 2002)

Everest Capital Limited v. Everest Funds Management, L.L.C., Civ. 8:02CV34 (D. NE, 2002)

Staples Stillwell Hughes v. Hewlett-Packard Company, 01 CVS 46 (Sup Ct, N. C. 2002)

The Talaria Company LLC, et al v. Belkov, et al, S 01 CV 3716 (D.C. MD 2002)

Duramed Pharmaceuticals, Inc. v. Wyeth-Ayerst Laboratories, Inc., C-1-00-735 (D.C. Ohio 2002)

Federal Trade Commission v. Mercury Marketing, Civ 00-CV-3281 (E.D. PA 2003)

Arrow Trading Co. v. Victorinox AG and Wenger SA, TAB 103,315 (2003)

Pilot Corporation of America v. Fisher-Price, Inc., 3:04-CV-00977 SRU (2004)

Teleflora LLC v. The Claria Corporation, (C.D. CA) 2004

Syngenta Crop Protection, Inc. v. Sipcam Agro USA, Inc., CIV 03-1149-GMS (D.C. Delaware 2004)

Verizon Directories Corp. v. Yellow Book USA, 04-CV-0251 (JBW) (2004)

FiberMark, Inc. v. Brownville Specialty Paper Products Inc. CIV 7:02-CV-0517 (TJM-DEP) (N.D. NY) 2004

Avid Identification Systems, Inc. v. Allflex USA, Inc. et al.  (Case No. 04-C-0067-S) W.D. Wisconsin (2004)

Kaveh Harounian and Union Outlet, Inc. v. The Coca-Cola Company, CV 03-8219 LGB (SHx) (C.D. CA 2005)

Jamdat Mobile, Inc. v. Jamster International, SARL, Ltd. et al, CV 05-3945 PA (FMOx) (C.D. CA 2005)

Sharper Image Corporation, v. The May Department Stores Company et al. C-04-0824 CW (N.D. CA) (2005)

Walker Zanger, Inc. v. Paragon Industries, Inc. dba Bedrosians, C04-1946 VRW (N.D. CA) (2005)

Ty, Inc. v. Softbelly's Inc., CV 00C5230 (E.D. IL) (2005)

Children's Medical Center of Dallas v. Columbia Hospital at Medical City Dallas Subsidiary, L.P., CV 3:04CV2436R (N.D. TX 2006)

The Nautilus Group, Inc. f/k/a/ Direct Focus, Inc. v. Icon Health & Fitness, Inc., CV02-2420RSM (W.D. WA 2006)

Republic Tobacco, L.P., vs. North Atlantic Trading Co., Inc., et al. Case No. 062738 (N.D. IL 2006)

Merisant Company v. McNeil Nutritional LLC and McNeil PPC Inc., CIV 04CV5504 (D.C. Pa) 2006

Hansen Beverage Company v. National Beverage Corp., CV 06-5470 ER (CTx) (U.S.C.D. CA 2007)

Adidas-Salomon AG and Adidas America, Inc., v. Payless Shoesource, Inc. CV01-1655 JE (U.S.D.C. OR 2007)

Fruit of the Earth, Inc. v. Schering-Plough Healthcare Products, Inc., CIV 308CV-786-M (N.D. TX) 2008

_April 26, 2010_
Date

_Henry D. Ostberg_
Henry D. Ostberg

(18)